IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 00-50522
_____


CHRISTINE MATO,

                              Plaintiff-Appellee-Cross-Appellant,

                    versus

JACK BALDAUF, DR.; ET AL.,

                                        Defendants,

JACK BALDAUF, DR.; JEFF FOX, DR.;
TEXAS A&M UNIVERSITY SYSTEM;
TEXAS A&M UNIVERSITY;TEXAS A&M
UNIVERSITY OCEAN DRILLING PROGRAM,

                    Defendants-Appellants-Cross-Appellees.

_____

Appeals from the United States District Court for the
                Western District of Texas
_____

October 9, 2001

Before GARWOOD, JOLLY, and DeMOSS, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

    A jury found that Texas A&M University terminated Christine

Mato's employment in retaliation for helping female employees file

sexual harassment complaints, and then awarded Mato approximately

$216,000 for lost wages and $250,000 for pain and suffering.  The

1

district court entered judgment and awarded Mato attorneys' fees and costs in the amount of $50,000, which was less than one-fourth of what she had requested.  Both parties have appealed.  Texas A&M contends that (1) Mato failed to provide sufficient evidence of a causal connection between her protected Title VII activity and her discharge from employment; and (2) Mato's evidence regarding pain and suffering cannot justify the size of the jury's mental anguish award.  Mato has filed a cross-appeal, contending that the district court abused its discretion by reducing her request for attorney's fees.  We conclude that Mato has failed to present sufficient evidence to support a causal connection between her protected activity and her discharge.  We therefore reverse and remand for entry of a judgment dismissing the complaint.

I

Texas A&M University coordinates the science operations for the Ocean Drilling Program ("ODP").  ODP is an international research project whose drilling vessel sails around the world and obtains core samples from the ocean floor.

Christine Mato was ODP's "Supervisor of Curation and Repositories" from 1984 to 1996.  Mato's primary responsibilities were archiving ODP's collection of core samples and reviewing scientists' requests to conduct research on certain samples.  According to the 1996 organizational chart, Mato was directly responsible to Dr. Russ Merrill, the "Manager of Information

2

Services and Curation."  It is generally agreed, however, that Merrill focused on information services and delegated almost all his curatorial duties to Mato.

Between 1990 and 1995, Mato helped five female co-workers file internal sexual harassment complaints against certain members of ODP staff.  Although most of the allegations were relatively non-serious (such as crude humor), one complaint against a drilling superintendent on the ship led to a serious internal investigation of sexual harassment at ODP.

Mato testified that Rick McPherson, a Texas A&M administrator who supervised personnel functions at ODP, told her that the report was an embarrassment to the program and that she would not receive any pay raises in the future.  (McPherson denies making these statements, but we must assume the jury found otherwise.)  Indeed, Mato did not receive a raise between 1993 and 1996.  Although she had been informed that salaries were frozen, Mato testified that some male employees at ODP had received pay raises during this period.

In 1993, Mato complained that Jack Baldauf, the associate director at ODP, was not responding in a timely manner to one of the allegations of sexual harassment.  Baldauf admitted at trial that he was "frustrated" with Mato's criticism because he believed he was pursuing the matter expeditiously.

3

Mato contends that, as a result of her involvement in these five incidents of sexual harassment between 1990 and 1995, her employment was terminated when ODP was reorganized in December 1996.

The reorganization plan was developed by Jeff Fox, who became the director of ODP in June 1995. The evidence is undisputed that the international committee that oversees ODP believed the program was operating inefficiently. Throughout late 1995 and early 1996, Fox circulated memoranda to his managers and staff, warning them that budget cuts were likely.

In June 1996, Fox decided to thoroughly reorganize ODP in order to make the program more efficient and economical. Fox hired a consulting firm, American Management Consultants ("AMC"), to study ODP and to recommend changes. Fox placed Jack Baldauf in charge of carrying out the reorganization process. At Fox's request, Baldauf was assisted by Jan Radle, an assistant to Rick McPherson.

Baldauf testified that he worked closely with Fox on the reorganization plan. According to Baldauf, Fox decided at the outset that it was necessary to consolidate the curatorial positions occupied by Mato and Dr. Merrill and to require the new curator to have a Ph.D. Baldauf testified that Fox never sought his advice regarding this decision; instead, Fox made the decision himself at a very early stage in the process. Fox himself

4

testified without contradiction, and without challenge, that the decision to require a Ph.D. for the new curator position was his, and his alone. He further testified without contradiction, and without challenge, that he had no discussions with Baldauf or McPherson about the Ph.D. requirement before making the decision. James Allen, who headed the search committee for the new curator, testified that Fox was responsible for the reorganization plan, and that Baldauf was merely carrying out a plan that had already been formulated.

As Baldauf's assistant during the reorganization period, Jan Radle helped develop Position Analysis Questionnaires ("PAQs"), or job descriptions, for positions within ODP. Radle testified that their initial description of the new curator position was virtually identical to the job description for the "Supervisor of Curation and Repositories" (Mato's position), except that the new curator would be required to have a Ph.D.

Radle was concerned that the new Ph.D. requirement could be perceived as targeting Mato, who has only a bachelor's degree and some graduate study. When Radle voiced her concerns to Baldauf and Fox, they told her directly that Mato would not become the new curator. Radle also testified that McPherson wanted to be kept abreast of the reorganization and that he was pleased when she told him about the impending changes in the curatorial division.

After formulating the PAQ for the new curator position, Radle

then forwarded the proposed PAQ to Karen Chavis at the Texas A&M Human Resources department. Chavis testified that she wondered why the ODP was creating a new curatorial position with duties very similar to those performed by Mato, who apparently was going to be laid off. Chavis then called a "risk assessment" meeting with Fox and Baldauf.

Baldauf testified that during this interview with Human Resources, Fox explained that he thought the Ph.D. requirement was necessary in light of ODP's focus on research and science operations. Moreover, Fox pointed out that almost all curators at similar repository programs hold a Ph.D., regardless of whether a Ph.D. is specifically required in the job description. Nevertheless, the Human Resources representatives advised Fox and Baldauf to determine the job requirements for curators in similar programs.

At Baldauf's request, Radle and Dr. Merrill contacted the NASA Moon Rocks program to determine whether NASA's curators were required to hold a Ph.D. Baldauf testified that Merrill told him that a Ph.D. was required at NASA. Radle testified, however, that a representative from NASA said that a Ph.D. was "preferred" but not required because a strict Ph.D. requirement would have excluded some of the people already serving as NASA curators. We must assume the jury believed Radle's version.

Radle also testified that after the risk assessment meeting,

6

Baldauf "massaged" the job description to make the Ph.D. requirement appear more justifiable. At some point, Baldauf added several new duties (such as developing a long-range sample distribution policy) that required "interacting with the science community" and exercising "proper scientific oversight" over the technical staff.

By the end of October 1996, Baldauf and Radle had prepared the final PAQ for the new curator position, and the Human Resources department approved the proposed Ph.D. requirement.

During this same period from June to October, the consultants from AMC were preparing their recommendations. In a lengthy report submitted on November 1, 1996, AMC suggested that the curation services be more closely aligned with the Science Operations division of ODP. The report noted that "Management of the curation function must carefully balance providing the maximum science that can be obtained from the [core samples] while preserving them for decades until new scientific technology enables even more information to be gleaned. The head of this function must combine in-depth scientific knowledge with adroit management and people skills to achieve this balance." AMC's first recommendation, therefore, was to "Reassign Curation Services to Science Operations with a scientist as the division head." Although the consultants' report does not mention a Ph.D. requirement, Fox interpreted AMC's recommendation for a "scientist" to require a Ph.D.-credentialed

7

research scientist who had published extensively in peer-reviewed journals. On cross-examination, Mato attempted to discredit the consultants' recommendation by gaining an admission from Fox that he had met with the consultants regularly as they were conducting their research and developing their report.

ODP's reorganization plan was made public in December 1996. The plan eliminated 14 positions, created 5 positions, modified 16 positions, and relocated 40 positions within the program. (To put the scope of the reorganization in perspective, we note that ODP had approximately 160 employees as of mid-1996.)

The plan eliminated the positions held by Merrill and Mato. Dr. Merrill remained at the ODP to head the information services division, while Mato was ineligible for the newly created position of curator because she did not have a Ph.D. Several of Mato's witnesses -- such as Dr. Jamie Allan, the acting director of science operations; and Dr. Phillip Rabinowitz, the former director of ODP -- expressed the opinion that the Ph.D. requirement was unnecessary because 80 to 90% of the new curator's duties were identical to those that Mato had performed.

The Ph.D. requirement notwithstanding, Mato applied for the new curator position but was not considered for the job. The following month, the ODP hired a research scientist with a Ph.D., Dr. John Firth, as its new curator.

II

In December 1998, Mato filed this employment discrimination action against Jeff Fox, Jack Baldauf, Rick McPherson, the Texas A&M University System, Texas A&M University, and the University's Ocean Drilling Program. The case went to trial in February 2000. The district court entered judgment as a matter of law for the defendants on Mato's Equal Pay Act claim. By the time the case was presented to the jury, only one defendant (Texas A&M University) and two Title VII claims (sex discrimination and retaliation) remained.

The jury found no discrimination based on sex, but it did find that University officials discharged Mato in retaliation for helping other female employees file sexual harassment claims. The jury awarded Mato approximately $216,000 in compensatory damages and $250,000 for pain and suffering.

The district court modified the judgment by adding prejudgment interest to a back pay award and reducing the award slightly to comply with Title VII statutory caps. The district court denied Texas A&M's motion for a new trial as well as its motion to reduce the jury award. Mato then filed a motion seeking attorney's fees and costs in excess of $200,000, but the district court awarded only $50,047.76. The University appeals the jury's verdict on retaliation and the damages award. Mato cross-appeals as to the attorney's fee award, but not as to the judgment as a matter of law on her Equal Pay Act claim or as to the verdict on her sex

9

discrimination claim.

## III

We need only resolve the first issue presented on appeal, whether Mato introduced sufficient evidence to allow a jury to find a causal connection between her protected activities and her discharge from employment.

## A

Title VII makes it unlawful for an employer to retaliate against an employee "because [that employee] has opposed any practice made an unlawful employment practice by this subchapter . . . ." 42 U.S.C. S 2000e-3(a). To prevail on her Title VII retaliation claim, Mato had to prove, *inter alia*, that a causal connection existed between the protected activity and the adverse employment action. See Messer v. Meno, 130 F.3d 130, 140 (5th Cir. 1997), cert. denied, 525 U.S. 1067 (1999). We will therefore focus on the protected activity that she proved: encouraging and assisting other women to file sexual harassment complaints; and on the retaliation she claims: requiring a Ph.D. for the curator's position and the consequential termination of her employment. Mato had the burden, then, of proving she would not have been terminated "but for" her helping other women file grievances based on sexual harassment. See Seaman v. CSPH, Inc., 179 F.3d 297, 301 (5th Cir. 1999); Rubinstein v. Administrators of Tulane Educ. Fund, 218 F.3d 392, 402-03 (5th Cir. 2000)("[E]ven if a plaintiff's protected

conduct is a substantial element in a defendant's decision to terminate an employee, no liability for unlawful retaliation arises if the employee would have been terminated even in the absence of the protected conduct."), cert. denied, 121 S.Ct. 1393 (2001).

In establishing this causal connection, Mato must first identify who made the decision that resulted in her termination. For example, Long v. Eastfield College, 88 F.3d 300 (5th Cir. 1996), involved an executive officer, on the one hand, with the final authority to fire employees but who had no retaliatory animus toward the plaintiff; and, on the other hand, intermediate supervisors who appeared to have had an improper retaliatory intent and who recommended that an employee be fired. We explained that the causal link between the protected conduct and termination is broken where the official with final authority to fire employees conducts an "independent investigation" in the course of reaching his or her decision. Id. at 307. The causal link is not broken, however, where the decision-maker "rubber-stamps" the firing recommendation of subordinates; in such cases, we say that the decision-maker acts as a conduit of the subordinates' improper motive. Id.; see also Russell v. McKinney Hospital Venture, 235 F.3d 219, 226-27 (5th Cir. 2000) ("If the [plaintiff] can demonstrate that others had influence or leverage over the official decisionmaker, . . . it is proper to impute their discriminatory [or retaliatory] attitudes to the formal decisionmaker."). Of

11

course, the degree to which the executive's decision was based on his or her own independent evaluation is a question of fact. Long, 88 F.3d at 307.

Texas A&M contends that it is entitled to judgment as a matter of law because Mato presented insufficient evidence of causation. We will disturb a jury verdict, however, only if we conclude that, after viewing the trial record in the light most favorable to the verdict, there is no "'legally sufficient evidentiary basis' for a reasonable jury to have found for the prevailing party." Stokes v. Emerson Elec. Co., 217 F.3d 353, 356 (5th Cir. 2000)(quoting Boeing Co. v. Shipman, 411 F.2d 365 (5th Cir. 1969)(en banc)).

B

In the light of Long v. Eastfield College, the first step is to determine whether Fox decided independently that the new curator should be required to have a Ph.D., or whether Fox's decision regarding the Ph.D. requirement resulted from the influence of Baldauf and McPherson, who, we shall assume, were motivated by retaliatory animus.

According to the district court, "It was Mato's theory that at least two of these A&M representatives -- McPherson and Baldauf (Fox's right-hand man in planning the ODP reorganization) -- were in fact 'responsible for her discharge' because they successfully

12

prevailed upon Fox to terminate Mato." Stated more precisely, perhaps, Mato contends that they prevailed upon Fox to insist upon the Ph.D. requirement to create a pretext for terminating Mato. But from a review of the record, this does not appear to be the case. We agree that Mato produced ample evidence that Baldauf and McPherson were significantly responsible for developing and implementing the decisions of Fox during the reorganization process. But Mato has produced no evidence that would allow a jury to conclude that either of them were responsible for the decision to require the new curator to have a Ph.D.

Mato contends that she presented considerable evidence that Baldauf and McPherson were indeed responsible for her discharge. Mato relies exclusively on Jan Radle's testimony that Baldauf was "in charge of ODP's reorganization activities"; that Baldauf helped develop the PAQ for the new curator position and "massaged" the job description after meeting with Human Resources; and that McPherson appeared pleased with the results of the reorganization plan. Radle's testimony, however, does no more than merely confirm what is essentially undisputed and we fully accept for the purposes of our analysis: that Baldauf and (to a much lesser extent) McPherson were *involved* in the reorganization process. But we may not extrapolate simply from their involvement in the process that Baldauf and McPherson were responsible for Mato's termination. Radle's testimony, in other words, does not permit a jury to infer

13

that Baldauf and McPherson exercised such influence over Fox that he was only a conduit for their improper retaliatory motives.

In fact, Radle's testimony on the question of who made the relevant employment decision is consistent with the unequivocal testimony of Baldauf and Fox -- that Fox made the decisions regarding the curatorial positions quite early in the reorganization process and that Fox never consulted with Baldauf before deciding to require a Ph.D. for the new curator position. Indeed, there is <u>no</u> <u>evidence</u> that contradicts the testimony that the idea to require a Ph.D. for the position of curator originated with Fox and Fox alone. The undisputed testimony simply established that Fox placed Baldauf in charge of carrying out his mandates, including the Ph.D. requirement. In this connection, it was Baldauf's responsibility to develop the necessary job descriptions to accommodate Fox's reorganization plans.

To be sure, the jury may have disbelieved much of the testimony of Fox and Baldauf. It is settled, however, that "disbelief of a witness's testimony is not sufficient to carry a plaintiff's burden." <u>Travelhost, Inc. v. Blandford</u>, 68 F.3d 958, 965 (5th Cir. 1995). As we have indicated, no witness testified, nor has Mato seriously suggested, that the requirement for the Ph.D. originated with anyone other than Fox. A reasonable fact finder could draw only one inference from the evidence in this record: Dr. Jeff Fox, ODP's director, independently made the

14

initial and basic decision that adversely affected Christine Mato -- that is, to consolidate the curatorial positions and require that the new curator hold a Ph.D.

C

The next question, then, is whether Mato presented sufficient evidence that her protected activities had the necessary causal connection to Fox's ultimate decision to implement the Ph.D. requirement, which resulted in Mato's termination. Stated in terms of the relevant case law, does the evidence permit a finding that

"but for" Mato's protected activities, Fox would not have required a Ph.D. for the curator's position?

Mato presented no direct evidence of retaliatory animus on the part of Fox. Mato contends, though, that a jury could have inferred the fact of retaliation from the falsity of Texas A&M's proffered explanation for terminating Mato's employment. This court has held that the familiar McDonnell Douglas burden-shifting framework applies in Title VII retaliation cases. See Rios v. Rossotti, 252 F.3d 375, 380 (5th Cir. 2001); Rubinstein, 218 F.3d at 401-02. As the Supreme Court explained in Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148 (2000), a plaintiff must present "sufficient evidence" for a jury to reasonably conclude that the employer's justification is unworthy of credence and is a pretext for discrimination or retaliation. See Crawford v. Formosa

15

<u>Plastics Corp.</u>, 234 F.3d 899, 902-03 (5th Cir. 2000).

Texas A&M's asserted reason for terminating Mato's employment may be summarized as follows. Because of pressure to improve its operations and cut its budget, ODP's new director formulated a comprehensive reorganization plan. The overriding theme of Fox's reorganization plan was its focus on science operations. Along these lines, Fox decided that the two curatorial positions needed to be consolidated and that the department should be headed by a Ph.D.-credentialed research scientist. A consulting firm reached virtually the same conclusion. Because Mato was not a research scientist who had earned a Ph.D., she was not eligible for the new curatorial position.

A review of the record makes plain that Mato failed to present sufficient evidence that would allow a jury to conclude that this reorganizational decision was phony and a pretext to retaliate against Mato. Mato's argument focuses on her belief that a Ph.D. was not required because she had performed almost all of the same duties for the previous twelve years. It is certainly true that Mato's witnesses established that 80 to 90% of the new curator's duties were identical to those performed by Mato and that, in their opinion, the Ph.D. requirement was unnecessary. However, we have repeatedly and emphatically stated that anti-discrimination laws "are not vehicles for judicial second-guessing of business decisions." <u>Deines v. Texas Dept. of Protective & Regulatory</u>

16

<u>Serv.</u>, 164 F.3d 277, 281 (5th Cir. 1999). In this case, Mato and her witnesses have done nothing more than register their disagreement with Fox's business plans for ODP.

Moreover, Mato failed to present any evidence that Fox even knew that Mato had helped female co-workers file sexual harassment claims. The record indicates that all five incidents of sexual harassment occurred between 1991 and early 1995 -- before Fox became the director of ODP. Fox testified that neither Baldauf nor McPherson had discussed Mato's activities with him, and Mato failed to show that Fox had learned about Mato's activities from any other source. Mato thus presented no evidence from which a jury could reasonably infer that Fox knew about the sexual harassment complaints that Mato had helped file.

A final consideration is the period of time that elapsed between the last filing of a sexual harassment complaint and the reorganization plan that led to Mato's termination. The fact that approximately a year and a half passed between the last sexual harassment complaint and Mato's termination does not support an inference of retaliation. <u>See</u>, <u>e.g.</u>, <u>Grizzle v. Travelers Health Network, Inc.</u>, 14 F.3d 261, 268 (5th Cir. 1994)(noting that a ten-month lapse between the plaintiff's complaint and her termination from employment "suggests that a retaliatory motive was highly unlikely").

In sum, Mato has fallen short of presenting sufficient

17

evidence to permit a jury to reasonably infer that ODP's justification for the Ph.D. requirement is unworthy of credence, that is, phony, and a pretext for retaliation. See Crawford, 234 F.3d at 903. The evidence does not support a finding that "but for" Mato's protected activities, Fox would not have consolidated the curatorial positions and required the new curator to hold a Ph.D.

IV

Having studied the full trial record, and viewing the evidence in the light most favorable to the verdict, we conclude that Texas A&M was entitled to judgment as a matter of law because Mato presented insufficient evidence of a causal connection between her protected Title VII activities and her termination from employment. For the foregoing reasons, the judgment is REVERSED and the case is REMANDED for entry of a judgment dismissing the complaint.

R E V E R S E D .