OWEN, Circuit Judge,
concurring in the judgment in part and dissenting in part:
The concurring and dissenting opinion issued March 23, 2012, is withdrawn. The following is substituted.
I would affirm the district court’s judgment in its entirety. I therefore concur in the panel majority’s judgment regarding its disposition of the claims of Jesse James Frank and Clarence Cargo. I do not agree with all of Judge Dennis’s reasoning as to those claims, however, and join in the judgment only with regard to Frank and Cargo. I dissent with respect to the claims asserted by Thomas Turner and Lester Thomas because I would affirm the district court’s grant of summary judgment in favor of Kansas City Southern Railway Company (KCSR).
I
There is error in Judge Dennis’s opinion that pervades its analysis of Thomas Turner’s claims. First, at the second stage of the familiar burden-shifting framework set forth in McDonnell Douglas Corp. v. Green,[1] KCSR was required to produce evidence of a legitimate, nondiscriminatory reason for its adverse employment action against Turner, not why it chose termination instead of a lesser disciplinary action or why it did not terminate other employees for similar violations.[2] KCSR has met its burden of production because there is evidence that Turner violated operational rules, termination was within the range of options for disciplining such violations, and Turner was told he was terminated due to those violations. Second, Judge Dennis’s opinion incorrectly focuses only on whether there is evidence of the reason that J.R. Thornell decided to terminate Turner. Judge Dennis’s opinion rejects KCSR’s arguments that Thornell was not the final decision-maker and that two independent internal reviews were thereafter conducted as to whether Turner had violated operational rules and whether the discipline for those violations was appropriate. Evidence regarding these reviews establishes a neutral reason for the actions that KCSR took.[3] In fact, after the two internal reviews of the disciplinary action taken against Turner, a third re *906 view was conducted by a three-member Public Law Board that included a union representative and a neutral public member. The Board unanimously held: “[u]pon the whole record and all the evidence, ... shoving the disabled engine over a derail can be attributed to [Turner’s] negligence in not following the Rules.” However, the Board converted the termination “to a long suspension,” which amounted to more than a year, and directed that Turner be reinstated without back pay. The Board also admonished that, “[t]he next time [Turner] faces a disciplinary hearing for any infraction of the Rules, the next Board will surely weigh the two dismissals that were converted to long suspensions in judging the severity of the discipline.”
Evidence that KCSR had a legitimate, non-discriminatory reason for concluding that Turner violated operational rules and terminating him abounds. I am mystified how anyone could conclude otherwise.
A
If the record before us does not contain evidence of a non-discriminatory reason for terminating Turner, then very few records would satisfy that burden of production. Within two weeks after the derailment, KCSR held an extensive hearing, with sworn testimony that was transcribed, about the cause of the derailment. The record of that hearing is voluminous. The entire focus of Turner’s disciplinary proceedings at each stage was the cause of the derailment and who was at fault. In fact, there is no evidence that Turner was terminated for any reason other than his fault in the derailment, except for the alleged disparate treatment of other employees, which will be discussed in more detail below. While Turner continues to dispute any wrongdoing in causing the derailment, the evidence is overwhelming that KCSR thought that he was primarily, if not solely, at fault, and that he had violated operational rules. “[E]ven an incorrect belief that an employee’s performance is inadequate constitutes a legitimate, nondiscriminatory reason” for an adverse employment action.[4]
There is sufficient evidence to satisfy the employer’s burden of production in the burden shifting framework in employment discrimination cases.[5] Contrary to Judge Dennis’s opinion, the evidence frames the issue “with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext.”[6]
B
Judge Dennis’s opinion mistakenly focuses on the initial decision to terminate Turner. P.A. Lobello testified that after presiding over the evidentiary hearing, he concluded that Turner had violated operational rules and that those violations had resulted in the derailment. But Lobello did not decide the disciplinary action to be taken. He identified Thornell as the individual who made that decision. However, this was not the final employment decision. Two independent investigations were subsequently conducted within KCSR, and evidence of the reasons given for Turner’s discipline at the conclusion of each of those reviews must be considered.
*907 There is evidence that after Turner received the letter dated October 23, 2002, signed by Lobello, which said that Turner had violated seven specified operating rules and that Turner was terminated, two subsequent independent internal reviews occurred at Turner’s request. First, Turner’s union representative appealed the disciplinary ruling in Lobello’s letter to Denise Brame, an African American whose title was Manager-Labor Relations. In a letter dated February 3, 2003, Brame informed Turner’s representative that she had “carefully reviewed the transcript of the formal investigation held and the discipline assessed” and that she had concluded that “[t]he discipline issued in this case was fully warranted and clearly supported by the facts adduced at the formal investigation.” The letter set forth the specific violations committed by Turner. The letter further stated
Mr. Turner received due process in accordance with the Collective Bargaining Agreement. As a result, the formal investigation was fair and impartial. There was no showing of any arbitrary or capricious action against Mr. Turner by the Carrier, nor could the penalty issued be determined as unwarranted or excessive due to the importance of the proven rule violations.
This is admissible evidence of the reason articulated by KCSR for terminating Turner. It is sufficient to meet KCSR’s burden of production, even if there were no other evidence of why Turner was terminated.
A second internal review of Turner’s termination occurred after Brame sent her letter. Kathleen Alexander, whose title was Director of Labor Relations for KCSR, informed Turner’s representative in a letter dated May 8, 2003, that Turner’s request for reinstatement and lost pay remained declined because Turner “was afforded a fair and impartial investigation and the transcript clearly proved that Claimant was guilty of the rules violations with which he was charged.”
Turner pursued a further appeal to the Public Law Board, which consisted of a union representative, a KCSR member, and a neutral member. The Public Law Board likewise concluded that Turner was at fault in connection with the derailment, but the Board converted his dismissal to a long suspension and directed that he be reinstated without back pay.
The initial decision to terminate Turner, whether made by Thornell or another KCSR employee, was not “rubber-stamped” by any of those involved in the subsequent investigations of whether Turner had violated operational rules and the appropriate punishment.[7] Evidence regarding KCSR’s entire process in disciplining Turner should be considered.
The facts before us are similar to, though far less damning than, those before the Seventh Circuit in Jennings v. Illinois Department of Corrections.[8] In Jennings, a correctional officer was terminated for smuggling contraband into a prison and trading that contraband with inmates for goods from the prison commissary.[9] Jennings contended that he was terminated and denied “a last-chance settlement agreement” because he was Mexican-American.[10] There was, in the words of the Seventh Circuit, “a plethora of evidence of discriminatory remarks and comments” about Mexican-Americans *908 in general and Jennings, personally, by two individuals involved in investigating Jennings and recommending his termination, including the prison’s warden.[11] There was also evidence that “non-Mexican-Amerieans were treated more favorably when caught engaging in prohibited conduct.”[12] However, the Seventh Circuit looked beyond the two individuals’ improper motivations.[13] That court considered evidence that the warden had initiated an investigation against Jennings, in the course of which an independent investigator interviewed eight inmates and Jennings and concluded that Jennings engaged in the charged conduct.[14] The evidence also revealed that the other individual who had made racially charged statements recommended a hearing before the correctional center’s Employee Review Board after the independent investigation had concluded.[15] That Board recommended discharge, and the warden signed the discharge.[16] The Illinois Department of Central Management Services approved the discharge.[17] The Seventh Circuit held that even assuming Jennings had made a prima facie case, the employer had met its burden of proffering a legitimate explanation of its adverse employment action by offering evidence of the independent investigation and independent arbitrator’s conclusions that Jennings had engaged in trading and trafficking, which was prohibited conduct.[18]
In the present case, the decisional process beyond Thornell’s involvement must be considered and provides evidence of a legitimate, nondiscriminatory reason for Turner’s termination. When evidence of that process is considered, the district court’s ruling as to Turner must be affirmed.
C
Judge Dennis’s opinion concludes that the affidavit from J.R. Thornell, dated almost seven years after the derailment, is no evidence at all of a legitimate, nondiscriminatory reason for the adverse employment action against Turner. I disagree. Thornell’s affidavit is entirely consistent with all of the contemporaneous evidence of the reason for Turner’s discharge. Furthermore, Turner knew that Thornell was involved in the disciplinary actions against him as early as the initial evidentiary hearing held within two weeks after the derailment. Judge Dennis nevertheless takes KCSR to task for not identifying Thornell sooner than it did in answers to discovery requests.
My colleague apparently would require Thornell to explain why he disciplined Turner by terminating him, instead of some lesser sanction, and to further explain why he did not terminate other employees who violated operational rules. KCSR is not required to come forward with such evidence at the second stage of the burden-shifting framework of McDonnell Douglas. As the Second Circuit has explained, the employer does not have the burden at the second stage of rebutting pretext.[19] Such a “requirement would place on the employer at the second stage of the McDonnell *909 Douglas process ‘the burden of showing that the reason for the rejection was not a pretext, rather than requiring such proof from the employee as a part of the third step.’ ”[20]
Thornell avers in his declaration that as General Superintendent of Transportation, he “was the person responsible for making disciplinary decisions” regarding employees, although at times, another employee made such decisions. Thornell “made many hundreds of these decisions” and has no specific recollection of Turner’s case. However, Turner recalls that Thornell was having a discussion with Lobello outside the hearing room prior to the evidentiary hearing held shortly after the derailment. Turner knew that Thornell was involved in the decision-making process and tried to discuss his ease with Thornell as Thornell and Lobello were conversing. Thornell rebuffed Turner’s effort.
Lobello testified in his deposition in the present case that Thornell made the decision to terminate Turner after the hearing had concluded. Therefore, there is evidence that Thornell was the initial decision-maker regarding the consequences of Turner’s violations of operating rules.
Thornell affirmatively states how he reached disciplinary decisions. He would review the transcript of the investigation into the incident and the employee’s disciplinary history. He also relied on the disciplinary policy in effect at the time. He states that he never made a decision based on race. The affidavit is cumulative of considerable other evidence of the reason for Turner’s discharge and is some evidence of a legitimate, nondiscriminatory reason for discharging Turner. But even if the affidavit were not part of the record, there is more than sufficient evidence of a legitimate, non-discriminatory action for the employment decision.
Contrary to Judge Dennis’s opinion, all of the evidence presented by KCSR regarding Turner’s violation of operational rules and his termination frames the issue “with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext.”[21] I strongly disagree with Judge Dennis’s conclusion to the contrary.
D
The district court held that Thomas Turner, an African American, failed to establish a prima facie case of racial discrimination, and I would affirm the district court. Turner does not contend and cannot establish that after he was terminated and before his reinstatement, he was replaced with a white person. Turner’s position was not filled, and no engineers were hired at the New Orleans facility during this time period. Instead, Turner contends that he was disciplined more severely than other white employees. In order to establish a prima facie case on such a basis, Turner “must show that white employees were treated differently under circumstances ‘nearly identical’ to his.”[22] Turner’s circumstances are not similar enough to either of his proposed comparators (Schmitt and Mouney) to show disparate treatment. For the same reason, Turner cannot show that KCSR’s legitimate, nondiscriminatory reason for his dismissal was pretextual.
*910 Turner’s and Schmitt’s work histories are quite different. They had different jobs — Turner was an engineer, and Schmitt was a conductor. Turner controlled the movement of the train at the time of the derailment. Schmitt was on the ground, outside of the train. Their disciplinary histories differ significantly. While they may have had a comparable number of offenses, the offenses were not “nearly identical.” Schmitt’s positive alcohol test occurred fourteen years before the derailment at issue while he was a brakeman. Turner likewise had a positive test in the past, but Turner’s infractions continued over time. In 1974, a drug test showed the presence of long-lasting barbiturates in Turner’s system. In 1982, Turner was reprimanded for a deficient train inspection report. Six years later in 1988, Turner was suspended for failing a brake test. Turner had a positive drug and alcohol test only two years before the incident at issue in this case while he was an engineer, and he was terminated, until a review board reinstated him with the proviso that any violation of the reinstatement order’s terms would be sufficient grounds for dismissal. While the incident here did not implicate any of the reinstatement order’s terms, the mere existence of such an order is a major difference in the work histories of Turner and Schmitt.
Turner is also not similar to Frank Mouney. Almost all of the disciplinary actions against Mouney were for missed-call violations, unlike Turner’s more serious violations. In short, Turner’s work history is sufficiently different from both Schmitt’s and Mouney’s work histories to account for the differences in discipline. Nor has Turner pointed to anything that would show that KCSR’s reason for dismissal is “false or unworthy of credence.”[23] Accordingly, Turner has not met his burden of producing evidence to show that KCSR’s legitimate, non-discriminatory reason for his dismissal was a pretext for discrimination.
II
The district court concluded with regard to Lester Thomas that he failed to demonstrate that he was treated differently from similarly situated employees. The only comparator offered was Hall. For the reasons stated by the district court, Hall’s history of disciplinary actions was not comparable to Thomas’s, and Hall’s infractions were relatively minor. Hall received a five-day suspension while a helper for a sideswipe, a reprimand for a derailment while serving as engine foreman, a three-day deferred suspension for a “bad-ordered” car on an outbound train while he was a helper, and a five-day suspension for proceeding past a blue flag. By contrast, Thomas had received a 15-day suspension for failure to control the speed of a train, a five-day suspension for failing to protect a train in a shoving move and providing false information, a three-day suspension for failure to follow instructions, a 15-day deferred suspension for failure to follow instructions and other violations, a three-day suspension for failure to acknowledge the presence of a train, a reprimand for failure to sign a work order, a 45-day suspension and a 45-day deferred suspension for occupying the main track without authority, and a ten-day suspension and a 45-day deferred suspension for derailment. The disciplinary histories of Thomas and Hall are not comparable, much less “nearly identical.”
To allow a fact-finder to infer discriminatory intent from the disparate positions and disciplinary histories of the comparators that Turner and Thomas have offered is to allow a fact-finder to second-guess business decisions that KCSR employees *911 made in the furtherance of their job responsibilities and their responsibilities to insure a safe working environment. Judge Dennis’s opinion ignores our precedent: “we have repeatedly and emphatically stated that anti-discrimination laws ‘are not vehicles for judicial second-guessing of business decisions.’ ”[24]
* * * * * *
I would affirm the district court’s grant of summary judgment.

. 411 U.S. 792, 803, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

. Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); Mayberry v. Vought Aircraft Co., 55 F.3d 1086, 1091 (5th Cir.1995) (holding in a work-rule violation case that "by insisting that there was no racial motivation in its decision to suspend Mayberry [and] that the decision was based solely on its conclusion, following an investigation, that Mayberry was at least partially at fault ... [the employer] has discharged its burden of production.”).

. Lieberman v. Gant, 630 F.2d 60, 65 (2d Cir.1980) ("It is enough for the defendants in the second phase of the case to bring forth evidence that they acted on a neutral basis.”).

. Mayberry, 55 F.3d at 1091 (quoting Little v. Republic Ref. Co., 924 F.2d 93, 97 (5th Cir. 1991)).

. See St. Mary’s Honor Center v. Hicks, 509 U.S. 502, 506-07, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); Tex. Dep’t of Cmty. Affairs v. Burdine, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207(1981).

. Burdine, 450 U.S. at 255-56, 101 S.Ct. 1089.

. See generally Mato v. Baldauf, 267 F.3d 444, 450 (5th Cir.2001).

. 496 F.3d 764 (7th Cir.2007).

. Id. at 766.

. Id. at 766.

. Id.

. Id.

. Id. at 768.

. Id.

. Id.

. Id.

. Id.

. Id. at 768-69.

. Lieberman v. Gant, 630 F.2d 60, 65 (2d Cir.1980).

. Id. (quoting Bd. of Trustees of Keene State College v. Sweeney, 439 U.S. 24, 24-25 n. 1, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978)).

. Tex. Dep’t of Cmty. Affairs v. Burdine, 450 U.S. 248, 255-56, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

. Mayberry v. Vought Aircraft Co., 55 F.3d 1086, 1090 (5th Cir.1995) (quoting Little v. Republic Ref. Co., 924 F.2d 93, 97 (5th Cir. 1991)).

. Vaughn v. Woodforest Bank, 665 F.3d 632, 637 (5th Cir.2011).

. Mato v. Baldauf, 267 F.3d 444, 452 (5th Cir.2001) (quoting Deines v. Tex. Dep’t of Protective & Reg. Serv., 164 F.3d 277, 281 (5th Cir. 1999)).