# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 23, 2012

Lyle W. Cayce
Clerk

No. 09-30558

THOMAS D TURNER,

Plaintiff - Appellant

v.

KANSAS CITY SOUTHERN RAILWAY COMPANY,

Defendant - Appellee

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

Plaintiff - Appellant

THOMAS D. TURNER,

Intervenors - Appellants

v.

KANSAS CITY SOUTHERN RAILWAY COMPANY,

Defendant - Appellee

Appeals from the United States District Court
for the Eastern District of Louisiana

Before DENNIS, OWEN, and SOUTHWICK, Circuit Judges.

DENNIS, Circuit Judge:

In this employment discrimination case, the Equal Employment Opportunity Commission (EEOC) and Thomas D. Turner (collectively, "the plaintiffs") appeal the district court's grant of the summary judgment motion of

No. 09-30558

defendant Kansas City Southern Railway Company (KCSR), dismissing all of the plaintiffs' claims that the decisions to discipline Turner and three other African American employees for putative work-rule violations were based on race in violation of federal and state laws. We AFFIRM with respect to the claims based on the decisions to discipline Jesse Frank and Clarence Cargo because we conclude that the EEOC has failed to establish a prima facie case of discrimination with regard to those decisions. However, we REVERSE with respect to the claims based on the decisions to discipline Thomas Tuner and Lester Thomas because we conclude that the plaintiffs have established a prima facie case of discrimination; and that KCSR has failed to produce admissible evidence of legitimate, nondiscriminatory reasons for those decisions. Thus, a jury question exists as to whether the decisions to discipline Turner and Thomas were impermissibly based on race.

## I.

The discrimination claims of four KCSR employees are relevant in this appeal: Thomas Turner, Lester Thomas, Jesse Frank, and Clarence Cargo. All four are African American, and all four were disciplined between 2002 and 2004 following separate incidents involving putative violations of KCSR's workplace rules. The plaintiffs contend that these employees were disciplined, or received more severe discipline, because of their race. The circumstances leading to the complained-of discipline are as follows:

- Thomas Turner, a train engineer, was driving a train that was "shoving" a damaged engine onto a spur track when the damaged engine derailed at a low rate of speed. Turner was operating the locomotive and Thomas Schmitt, the train's conductor, was providing Turner with instructions from the ground via radio about how much more room remained before the damaged engine reached the end of the track. Turner and Schmitt blamed

2

No. 09-30558

each other for the accident. Turner was dismissed; Schmitt, who is white, was not disciplined.

- <u>Lester Thomas</u>, a train conductor, was performing a training exercise when the train that he was operating along with Joshua Hall, the engineer who was driving the train, failed to timely stop at a "dark signal" (a signal that did not show a green or red light). Thomas was dismissed; Hall, who is white, was dismissed but reinstated thirty days later.

- <u>Jesse Frank</u>, a train engineer, missed a shift in order to visit his uncle in the hospital. Frank was suspended for ninety days; Frank Mouney, a white engineer who missed a shift around the same time, was suspended for five days.

- <u>Clarence Cargo</u>, a train conductor, was operating a train that derailed after passing over an improperly locked switch. Cargo was dismissed; Scott Claiborne, the white engineer who was driving the train, was suspended.

All four employees administratively appealed their discipline pursuant to their collective bargaining agreements.[1] The appeals resulted in the discipline for Turner, Frank, and Cargo being reduced; Thomas, meanwhile, accepted a "leniency reinstatement" from KCSR while his administrative appeal was pending.

Independently of these administrative appeals, the plaintiffs sued KCSR regarding the initial disciplinary decisions. Turner filed suit against KCSR in

---

[1] Turner and Frank appealed first to Denise L. Brame, KCSR's Manager of Labor Relations; then to Kathleen A. Alexander, KCSR's Director of Labor Relations; and finally to Public Law Board No. 6647, which was comprised of Merle W. Geiger, a representative of the union; Kathleen Alexander, representing KCSR; and a neutral member, Robert L. Hicks. Cargo also initially appealed to Brame and then to Alexander; but instead of pursuing his appeal to the Public Law Board, Cargo appealed to the National Railroad Adjustment Board. Public Law Boards and the National Railroad Adjustment Board are provided for by the Railway Labor Act. *See* 45 U.S.C. § 153; Public Law 89-456, 80 Stat. 208 (1966).

No. 09-30558

federal district court in 2003, alleging that the initial decision to dismiss him was based on race in violation of 42 U.S.C. § 1981 and the Louisiana Employment Discrimination Law, La. Rev. Stat. § 23:332. In 2005, the EEOC, after conducting an investigation, filed suit against KCSR alleging that the initial disciplinary decisions against Turner, Thomas, Frank, and Cargo were based on race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Turner intervened in the EEOC's suit and the district court consolidated the two cases.

During the EEOC's investigation and the first few years of discovery in this litigation, KCSR identified the employees who investigated each of the incidents as the persons responsible for making the disciplinary decisions at issue—that is, the decisions to dismiss Turner, Thomas, and Cargo, and to suspend Frank. However, in depositions later conducted by the EEOC, those employees testified that they did not make these disciplinary decisions. At least one of the employees identified J.R. Thornell, who served as KCSR's General Superintendent of Transportation from 2002 to 2005, as the person responsible for making these decisions. Thereafter, in 2008, more than four years after these decisions were made, KCSR admitted that Thornell was the "likely" decisionmaker, but at the same time, averred that Thornell could no longer remember any of these specific decisions. KCSR later produced a declaration from Thornell stating that during the period in which these decisions were made, it was Thornell's responsibility to make disciplinary decisions regarding KCSR engineers and conductors; that in making such decisions, it was his usual practice to review the employee's infraction and employment history; but that he had no specific recollection of these decisions; and that he may have delegated the decisions to his assistant. The record contains no testimony from Thornell's assistant, A.J. Sonnier, who died during the litigation in this case.

4

No. 09-30558

KCSR moved for summary judgment; the district court granted the motion and dismissed all of the plaintiffs' claims. *Turner v. Kan. City S. Ry. Co.*, 622 F. Supp. 2d 374, 378 (E.D. La. 2009).[2] The district court adopted most of KCSR's summary judgment arguments and concluded that the plaintiffs had failed to establish a prima facie case of discrimination under the first step of the *McDonnell Douglas* burden-shifting framework. *Id.* at 386-89. The district court also concluded, in the alternative, that KCSR had met its burden at the second *McDonnell Douglas* step by producing evidence of legitimate, nondiscriminatory reasons for its disciplinary decisions of Turner, Thomas, Cargo, and Frank; and that the plaintiffs had failed to meet their burden at the third step of the *McDonnell Douglas* analysis to show that KCSR's proffered reasons were pretextual. *Id.* at 393-96. The plaintiffs timely appealed.

## II.

"This court reviews a district court's grant of summary judgment de novo, applying the same standards as the district court." *EEOC v. WC&M Enters., Inc.*, 496 F.3d 393, 397 (5th Cir. 2007) (citing *Turner v. Baylor Richardson Med.*

---

[2] The district court did not specifically mention Turner's § 1981 and Louisiana Employment Discrimination Law claims; however, the court's opinion stated that "'[a]ll claims against KCS[R] are hereby DISMISSED WITH PREJUDICE." 622 F. Supp. 2d at 396. Therefore, the district court disposed of Turner's § 1981 and Louisiana law claims along with the plaintiffs' Title VII claims. The parties do not contend that Turner's § 1981 and Louisiana Employment Discrimination Law claims should be analyzed or resolved any differently from the Title VII claims related to Turner. Indeed, employment discrimination claims under Title VII, § 1981, and the Louisiana Employment Discrimination Law are analyzed under the same standard. *See Lawrence v. Univ. of Tex. Med. Branch at Galveston*, 163 F.3d 309, 311 (5th Cir. 1999) ("Employment discrimination claims brought under 42 U.S.C. [§] 1981 . . . are analyzed under the evidentiary framework applicable to claims arising under Title VII . . . ."); *Knapper v. Hibernia Nat'l Bank*, 49 So. 3d 898, 902 n.11 (La. Ct. App. 2010) ("Claims under the [Louisiana Employment Discrimination Law] are subject to the same analysis as discrimination claims under federal Title VII of the Civil Rights Act of 1964." (citing *Hicks v. CLECO, Inc.*, 712 So. 2d 656 (La. Ct. App. 1998); *Plummer v. Marriott Corp.*, 654 So. 2d 843 (La. Ct. App. 1995))). Accordingly, our conclusion that the district court erred in granting summary judgment for KCSR on the plaintiffs' Title VII claims related to Turner applies equally to Turner's § 1981 and Louisiana Employment Discrimination Law claims.

*Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007)). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "On a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *WC&M Enters.*, 496 F.3d at 397 (citing *Hockman v. Westward Commc'ns, L.L.C.*, 407 F.3d 317, 325 (5th Cir. 2004)). Therefore, because KCSR moved for summary judgment, we must view the evidence in the light most favorable to the plaintiffs. "In reviewing the evidence, the court must . . . 'refrain from making credibility determinations or weighing the evidence.'" *Id.* at 397-98 (quoting *Turner*, 476 F.3d at 343).

Where a defendant has moved for summary judgment on an employment discrimination claim based on circumstantial evidence, as in this case, we apply the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[3] *See Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000). The first step of the *McDonnell Douglas* analysis requires "[t]he plaintiff [to] establish a prima facie case that the defendant made an employment decision that was motivated by a protected factor." *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1089 (5th Cir. 1995). If the plaintiff establishes a prima facie case, we proceed to the next stage of the analysis,

---

[3] Turner argues in his reply brief that "[s]ince [he] has provided direct evidence of a cover up intended to exonerate a white employee at the expense of a black employee, it is not necessary to work through the *McDonnell Douglas* test." Turner Reply Br. 13. However, in his opening brief, Turner argued only that this putative "direct evidence" established his prima facie case under the *McDonnell Douglas* framework. *See* Turner Br. 16, 19, 35. It is true that "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 621-22 (1985). Nonetheless, we will not decide if the evidence Turner points to qualifies as direct evidence of discrimination taking this case out of the *McDonnell Douglas* framework because Turner did not raise this argument in his initial brief, and "[t]his Court will not consider a claim raised for the first time in a reply brief." *Yohey v. Collins*, 985 F.2d 222, 225 (5th Cir. 1993).

No. 09-30558

where "the defendant bears the burden of producing evidence that its employment decision was based on a legitimate nondiscriminatory reason." *Id.* If the defendant carries its burden, the analysis moves to the third *McDonnell Douglas* step, where "[t]he burden . . . shifts back to the plaintiff to prove that the defendant's proffered reasons were a pretext for discrimination." *Id.*

## III.

First, we address whether the plaintiffs have met their burden to establish a prima facie case of discrimination.

### A.

#### i.

The Supreme Court and this court have explained the standard for establishing a prima facie case of discrimination in the context of a Title VII claim of disparate treatment. "The burden of establishing a prima facie case of disparate treatment is not onerous." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). The prima facie case is necessarily a flexible standard that must be adapted to the factual circumstances of the case. *Id.* at 253 n.6; *McDonnell Douglas*, 411 U.S. at 802 n.13. Nonetheless, "[t]he prima facie case serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons for the plaintiff's [discipline]." *Burdine*, 450 U.S. at 253-54. "[T]he prima facie case 'raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.'" *Id.* at 254 (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)).

This court has held that "[i]n work-rule violation cases," such as the instant case, "a Title VII plaintiff may establish a prima facie case by showing 'either [1] that he did not violate the rule[,] or [2] that, if he did, white employees who engaged in similar acts were not punished similarly.'" *Mayberry*, 55 F.3d at 1090 (quoting *Green v. Armstrong Rubber Co.*, 612 F.2d 967, 968 (5th Cir.

1980)).  "To establish a prima facie case in this [second] manner, [the plaintiff] must show that . . . employees [who were not members of the plaintiff's protected class] were treated differently under circumstances 'nearly identical' to his." *Id.* (citing, *inter alia*, *Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991)). "The employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories." *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009) (footnotes omitted).  Moreover, "the plaintiff's conduct that drew the adverse employment decision must have been 'nearly identical' to that of the proffered comparator who allegedly drew dissimilar employment decisions," because "[i]f the difference between the plaintiff's conduct and that of those alleged to be similarly situated *accounts* for the difference in treatment received from the employer, the employees are not similarly situated for the purposes of an employment discrimination analysis." *Id.* (internal quotation marks omitted).

However, we have made clear that "nearly identical" is not "synonymous with 'identical.'" *Id.*; *see also id.* at 260 n.25 ("[T]his Circuit's 'nearly identical' standard is not equivalent to 'identical.'"). "Applied to the broader circumstances of a plaintiff's employment and that of his proffered comparator, a requirement of complete or total identity rather than near identity would be essentially insurmountable, as it would only be in the rarest of circumstances that the situations of two employees would be totally identical." *Id.* at 260. "For example . . . [e]ach employee's track record at the company need not comprise the identical number of identical infractions, albeit these records must be comparable." *Id.* at 260-61.  "As the Supreme Court has instructed, the similitude of employee violations may turn on the 'comparable seriousness' of the offenses for which discipline was meted out and not necessarily on how a

8

No. 09-30558

company codes an infraction under its rules and regulations. Otherwise, an employer could avoid liability for discriminatory practices simply by coding one employee's violation differently from another's." *Id.* at 261 (citing *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 283 n.11 (1976)). "The relevant perspective is that of the employer at the time of the adverse employment decision." *Id.* at 261 n.27 (citing *Perez v. Tex. Dep't of Criminal Justice, Institutional Div.*, 395 F.3d 206, 210 (5th Cir. 2004)).

## ii.

The parties do not quarrel with these standards for establishing a prima facie case of discrimination in a work-rule violation case; they disagree, however, about another aspect of the prima facie case.[4] KCSR argues that to establish a prima facie case, the plaintiffs must show a "causal nexus" between the alleged discriminatory motivation of the person who decided to dismiss Turner, Thomas, and Cargo, and to suspend Frank, and the disciplinary decisions later rendered by the administrative appeals boards. KCSR refers to the decisions of the administrative appeals boards as "the ultimate discipline decisions," the "disciplinary actions at issue," and the "alleged adverse employment actions." KCSR Br. at 17-18, 47-48. KCSR is mistaken.

The decisions of the administrative appeals boards are *not* the decisions at issue. Instead, the plaintiffs' claims are that the *initial* decisions to dismiss

---

[4] The EEOC also contends that under *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273 (1976), it could establish a prima facie case of discrimination by showing that a black train engineer or conductor was disciplined more severely than the white conductor or engineer who was working on the train at the time of the incident—what the EEOC refers to as the "same incident test." However, the EEOC did not make this argument below, and therefore, we will not address it for the first time on appeal. *See Nasti v. CIBA Specialty Chems. Corp.*, 492 F.3d 589, 595 (5th Cir. 2007) ("If an argument is not raised to such a degree that the district court has an opportunity to rule on it, we will not address it on appeal." (internal quotation marks omitted)).

No. 09-30558

Turner, Thomas, and Cargo, and to suspend Frank violated Title VII. The EEOC's Amended Complaint[5] alleges:

> 7.      . . . . Defendant engaged in unlawful employment practices . . . in violation of . . . Title VII, 42 U.S.C. § 2000e-2(a) and §2000e-3(a).  Specifically:
>
>   A.   **Turner.** On or about October 23, 2002, Defendant terminated the employment of Turner on the basis of his race (Black), in violation of Title VII.
>
>   B.   **Frank.** On or about February 5, 2003, Defendant suspended Frank for 90 days on the basis of his race (Black), in violation of Title VII.
>
>   C.   **Cargo.** On or about May 29, 2003, Defendant suspended Cargo for 45 days on the basis of his race (Black) and/or in retaliation for engaging in protected activity, in violation of Title VII.  On or about January 23, 2004, Defendant terminated the employment of Cargo on the basis of his race, and/or in retaliation for engaging in protected activity, in violation of Title VII.
>
>   D.   **Thomas.** On or about March 12, 2004, Defendant terminated the employment of Thomas on the basis of his race (Black), in violation of Title VII.

Thus, the allegedly "unlawful employment practices" under Title VII[6] at issue in this case are these initial decisions and not the disciplinary decisions made by the administrative appeals boards.

KCSR mistakenly relies upon cases in which the final decisionmaker was different from the intermediate supervisor with discriminatory animus toward the plaintiff.  *See Jennings v. Ill. Dep't of Corrs.*, 496 F.3d 764 (7th Cir. 2007); *Mato v. Baldauf*, 267 F.3d 444 (5th Cir. 2001); *Sherrod v. Am. Airlines, Inc.*, 132

---

[5] Turner filed an Intervenor Complaint alleging that his claim "arises out of the same facts and circumstances, occurring at the same time, [and] involves the same set of witnesses, facts and laws as the matter contained in the EEOC's complaint; Title VII."

[6] Title VII provides, among other things, that "[i]t shall be an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ."  42 U.S.C. § 2000e-2(a).

No. 09-30558

F.3d 1112 (5th Cir. 1998). Here, by contrast, the plaintiffs contend that the final decisionmaker was Thornell; that he was motivated by discriminatory animus when he made the decisions to dismiss Turner, Thomas, and Cargo, and to suspend Frank; and that these decisions violated Title VII.

Therefore, we do not agree with KCSR that the plaintiffs need to show that the alleged discriminatory animus motivating the disciplinary decisions at issue in this case "caused" later decisions that are not at issue.

## B.

Turning to whether the plaintiffs established a prima facie case of discrimination, we conclude that, viewing the evidence in the light most favorable to the plaintiffs, the plaintiffs have met their burden with regard to the decisions to dismiss Turner and Thomas, but not the decisions to suspend Frank and to dismiss Cargo.

### i.

With regards to the decision to dismiss Turner, we conclude that the plaintiffs have met their burden to establish a prima facie case by showing that Turner received more severe discipline than a similarly situated white employee, Thomas Schmitt, under nearly identical circumstances. *See Lee*, 574 F.3d at 259-61.[7] "The employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories." *Id.* at 260. "[W]e require that an employee who

---

[7] We note that the plaintiffs also argue that they established a prima facie case by showing that Turner did not in fact violate any workplace rule. We need not address this argument, however, because we conclude that they have met their burden by showing disparate treatment of a similarly situated white employee. Of course, this does not foreclose the plaintiffs from presenting evidence to the jury that Turner did not violate a workplace rule and arguing that the jury can infer discrimination from such evidence.

proffers a fellow employee as a comparator [to] demonstrate that the employment actions at issue were taken under nearly identical circumstances." *Id.* (internal quotation marks omitted). However, we must keep in mind that we are reviewing KCSR's motion for summary judgment, and thus, we "must view the facts in the light most favorable to" the plaintiffs, *WC&M Enters.*, 496 F.3d at 397; and KCSR is required to "show[] that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a).

Turner was terminated following an incident on October 1, 2002, in which he and Schmitt were operating a train—Turner, as the engineer, was controlling the locomotive; Schmitt, as the conductor, was providing instructions to Turner via radio from the ground—when the damaged engine that their train was shoving onto a spur track derailed at a low speed. Turner's letter of termination stated that Turner was found to have violated KCSR "General Code of Operating Rules 2.13, 6.22, 6.28, 7.1, 7.12, and 7.2." The plaintiffs contend that a comparable employment action for Schmitt was the decision to not discipline him following the derailment incident for which Turner was dismissed. However, KCSR argues that this decision was not made under nearly identical circumstances because Schmitt was found not to be at fault in the derailment incident. The EEOC points to record evidence—*viz.*, the deposition of Paul Lobello, who was responsible for investigating this incident for KCSR—which indicates that Schmitt was also at fault. Therefore, according to the EEOC, the disparate decisions, most likely made by the same individual, J.R. Thornell, are comparable. Lobello's deposition, however, indicates that he believed that Schmitt and Turner were not necessarily equally at fault.

We need not decide, however, whether Turner's and Schmitt's conduct was "nearly identical" because the plaintiffs have offered another employment action for Schmitt that we conclude is comparable: the decision to suspend Schmitt for 45 days for a sideswipe incident that occurred on October 30, 2002, only a few

weeks after the derailment incident.  According to KCSR's own records relating to that incident, Schmitt was found responsible for "violation of restricted speed or the operational equivalent thereof, failure to protect a shoving movement on the main line resulting in a run through of the crossover switch, [and] sideswiping 2 hazardous material cars — [General Code of Operating Rules] 1.1.1, 1.6, 2.13, 6.28, 6.5, 7.1, 7.2 and System Timetable No. 5 Rule 1.16."

Two points convince us that Schmitt's violations arising from the sideswipe incident are comparable to Turner's putative violations in the derailment incident.  First, Schmitt was found to have violated most of the same workplace rules that Turner was found to have violated.  Second, KCSR does not dispute that there is a meaningful distinction between the rules that Turner and Schmitt were found to have violated.  Instead, KCSR argues that "[g]enerally, a derailment is a more serious incident than a sideswipe."  KCSR Br. 32 (citing a statement from the affidavit of KCSR's Director of Labor Relations that says, "a derailment is generally a more serious incident than a sideswipe").  In contrast to this general statement, Paul Lobello, who investigated both the derailment and sideswipe incidents, testified in his deposition about these specific incidents.  He testified that this sideswipe incident was "more severe" than the derailment incident in terms of "[t]he damages and the hazardous material," and that otherwise, "[t]he circumstances were the same . . . with regards to the fact that in both instances we had a locomotive engineer that operated without proper guidance."  "As the Supreme Court has instructed, the similitude of employee violations may turn on the 'comparable seriousness' of the offenses for which discipline was meted out and not necessarily on how a company codes an infraction under its rules and regulations," *Lee*, 574 F.3d at 261 (footnote omitted); and we have explained that "[t]he relevant perspective is that of the employer at the time of the adverse employment decision."  *Id.* at

261 n.27. Under that standard, and viewing the evidence in the light most favorable to the plaintiffs, these violations are comparably serious.

Additionally, the record evidence shows that Schmitt and Turner had "the same . . . responsibilities," and "had their employment status determined by the same person." *Id.* at 260. Although Turner was an engineer and Schmitt was a conductor, KCSR does not contend that Schmitt's responsibilities during the sideswipe incident were materially different than Turner's responsibilities during the derailment incident.[8] Further, KCSR has averred that J.R. Thornell is most likely the person who was responsible for making the decisions to dismiss Turner and to suspend Schmitt.

We are also satisfied that Turner and Schmitt had "essentially comparable violation histories." *Id.* According to KCSR's records, Turner had the following disciplinary history preceding the derailment incident: In December 2000, Turner was reinstated after having been dismissed in October 1999 for failing a random alcohol test; in 1988, he was suspended for ten days for a failed brake test; and in 1982, he received a written reprimand for a deficient train inspection.[9] KCSR acknowledges that Schmitt had the following disciplinary history preceding the sideswipe incident: In 1999, Schmitt was discharged for failing to follow directions (and later reinstated); in 1990, he received a written

---

[8] Indeed, KCSR quotes its own General Code of Operating Rule 1.47 as providing: "[T]he conductor and the engineer are responsible for the safety and protection of their train [and] observance of the rules . . . . [I]f any doubts arise concerning the authority for proceeding or safety, the conductor must consult with the engineer who will be equally responsible for the safety and proper handling of the train."

[9] The record in this case also includes a 1974 drug test for Turner that showed "a long acting barbiturate," but there is no indication that Turner was disciplined as a result of this test, and KCSR does not include this incident in its chart of Turner's "[d]iscipline [h]istory at [t]ime of [v]iolation." KCSR Br. 62.

reprimand;[10] and in 1988, he received two written reprimands and was later discharged for failing an alcohol test following a derailment in which he was the brakeman.  In sum, Turner had one prior violation serious enough to warrant dismissal and one violation serious enough to warrant a short suspension; on the other hand, Schmitt had two previous infractions serious enough to warrant dismissal both times.  These employment histories, which are marked by a comparable number of serious violations by train operators with similar responsibilities, are sufficiently similar to require comparison.  *See id.* at 261-62.

KCSR argues that Turner's and Schmitt's employment histories are not comparable because Schmitt's positive alcohol test occurred many years before the sideswipe incident when he was acting as a brakeman, whereas Turner's positive alcohol test occurred two years before the derailment incident when Turner was an engineer.  However, these distinctions do not render Turner's and Schmitt's employment histories incomparable.  We have "emphasize[d] . . . that this Circuit's 'nearly identical' standard is not equivalent to 'identical.'"  *Id.* at 260 n.25; *see also id.* at 260 ("We do not . . . interpret 'nearly identical' as synonymous with 'identical.'"); *id.* at 261 ("Each employee's track record at the company need not comprise the identical number of identical infractions . . . .").  A requirement of something more stringent than nearly identical employment histories would run afoul of the Supreme Court's instruction that "[t]he burden of establishing a prima facie case of disparate treatment is not onerous."  *Burdine*, 450 U.S. at 253.  It is also worth noting that Schmitt's positive alcohol test occurred in connection with an incident in which a train derailed, whereas Turner's test was a random test unrelated to any incident.  Therefore, Schmitt's alcohol incident was not so much less serious than Turner's as to undermine our conclusion that Schmitt and Turner had comparable employment histories.

---

[10] Turner also points out that the record shows that Schmitt was issued a second written reprimand in 1990.

No. 09-30558

The parties also quarrel over the significance of Turner's December 2000 reinstatement order. KCSR contends that "Turner's recent reinstatement was on a 'last-chance' basis, meaning he could be dismissed for *any* further violations." KCSR Br. 32; *see also id.* at 33 ("The order d[id] not limit [Turner's] last-chance status to alcohol/drug violations, nor d[id] it *preclude* his dismissal for other violations, such as derailment."). According to KCSR, Schmitt was not similarly situated to Turner because he was not on a "last-chance basis" at the time of the sideswipe incident. The EEOC responds that the reinstatement order was related only to drug and alcohol testing and there was no allegation that Turner was intoxicated or refused a drug or alcohol test in relation to the derailment incident; thus, the reinstatement order was not implicated.

We agree that the mere fact of the reinstatement order does not render Turner's disciplinary history incomparable to Schmitt's. The reinstatement order provided only that a violation of any of its terms would be "sufficient grounds for [Turner's] permanent dismissal," and the derailment incident did not implicate any of the terms of the reinstatement order. Therefore, the derailment incident did not, based on the terms of the reinstatement order, provide "sufficient grounds" to dismiss Turner. Moreover, in the same period of time that Turner had been dismissed and later reinstated, Schmitt had also been discharged, for failing to follow directions, and later reinstated. Thus, Schmitt's disciplinary history is comparable to Turner's, despite the reinstatement order.

KCSR may still argue to the jury that these distinctions between Turner's and Schmitt's infractions and employment histories account for the difference in their discipline; however, we cannot say that, viewing the evidence in the light most favorable to the plaintiffs, these distinctions show that the employment actions were not taken under nearly identical circumstances. Therefore, we conclude that the plaintiffs have met their burden to establish a prima facie case of discrimination with regard to the decision to dismiss Turner.

**ii.**

We also conclude that the EEOC has met its burden to establish a prima facie case of discrimination with regard to the decision to dismiss Lester Thomas by showing that a white employee, Joshua Hall, was disciplined less severely than Thomas under nearly identical circumstances.[11]

Thomas was dismissed following an incident in February 2004 in which the train that he and Hall were operating—Thomas was the conductor and Hall was the engineer—failed to stop within the appropriate distance of a "dark signal" during an unannounced safety test. Hall was initially dismissed, then reinstated thirty days later. KCSR's Disciplinary Action Reports for Thomas and Hall, generated after the investigation and hearing to determine whether any workplace rules were violated, both specify that Thomas and Hall committed the exact same infractions: "[General Code of Operating Rules] 1.1.1, 8.9, 8.9.1, 8.10 & TT No. 5[,] Page 198, Item 9[.] Failure to control train in accordance with a signal displaying a dark aspect at S. LaBarre in addition to f/t update consist after picking up cars from Baton Rouge Yard while serving as ['Engineer' in Hall's case, and 'Conductor' in Thomas' case] of the INOKC." Therefore, it is abundantly clear that Thomas' and Hall's violations "were essentially the same." *Lee*, 574 F.3d at 260 n.25.

KCSR argues that Thomas and Hall were not equally at fault for two reasons: "First, only Thomas failed to update the train consist, and thereby committed rule violations that Hall did not." KCSR Br. 39. However, KCSR's Disciplinary Action Reports for Thomas and Hall state that both men were found

---

[11] The EEOC argues also, as it did for Turner, *see supra* note 4, that it established a prima facie case by showing that Thomas did not in fact violate any workplace rule. As with Turner, we need not reach this argument because we conclude that the EEOC has met its burden by showing disparate treatment of a similarly situated white employee. Accordingly, we make the same observation here that we made with regard to Turner's claim: Our decision does not foreclose the EEOC from presenting evidence to the jury that Thomas did not violate a workplace rule and arguing that the jury can infer discrimination from such evidence.

to have failed to update the consist. Therefore, the record does not support KCSR's assertion. Second, KCSR argues that Thomas was more at fault for the failure of the train to timely stop because "[Thomas], but not Hall, failed to diligently watch for the signal as the rules require." *Id.* However, in *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273 (1976), the Supreme Court expressly rejected the argument that in order to establish a prima facie case the plaintiffs "were required to plead with 'particularity' the degree of similarity between their culpability in the alleged theft and the involvement of the favored coemployee." *Id.* at 283 n.11. Instead, the Court held that "precise equivalence in culpability between employees is not the ultimate question." *Id.* The ultimate question is "the 'comparable seriousness' of the offenses." *Lee*, 574 F.3d at 261, 260 n.25; *see also McDonald*, 427 U.S. at 283 n.11. Viewed in the light most favorable to the EEOC, Thomas's and Hall's offenses are comparably serious.

KCSR does not allege that Thomas and Hall are incomparable because of differences in their responsibilities; nor does it allege that the employment status of each was determined by different people. The only remaining issue is whether Thomas and Hall "have essentially comparable violation histories." *Lee*, 574 F.3d at 260. We conclude that they do. KCSR's only argument about why their histories are incomparable is based on the fact that Thomas had a greater number of violations than Hall—Thomas had eight infractions in his disciplinary history whereas Hall had only four. *See* KCSR Br. 39-40, 63. However, as the EEOC correctly points out, Thomas began working for KCSR in 1981, whereas Hall was hired in 2000. As we said in *Lee*, "[e]ach employee's track record at the company need not comprise the identical number of identical infractions, albeit these records must be comparable." 574 F.3d at 261. In *Lee*, we concluded that "employment histories marked by a comparable number of serious moving violations" were comparable by looking only at the violations that had occurred "[d]uring the same period." *Id.* In this case, in the four years preceding the

No. 09-30558

incident, during which time Thomas and Hall both worked at KCSR, Thomas had five violations to Hall's four;[12] both of them had three moving violations; and Hall was disciplined for an incident involving a sideswipe and another involving a derailment, whereas Thomas was cited for only one derailment. We must view the facts in the light most favorable to the EEOC, and KCSR must show the absence of a genuine dispute of material fact to be entitled to summary judgment. However, KCSR has made no argument about why Thomas' and Hall's infractions are incomparable. Thus, we conclude that Hall is a proper comparator whom the district court erroneously rejected.

### iii.

The EEOC contends that it established a prima facie case of discrimination with regard to the 90-day suspension of Jesse Frank for a missed call because Frank Mouney is a valid comparator, and Mouney was disciplined less severely than Frank under nearly identical circumstances. We disagree because Frank's and Mouney's employment histories are not sufficiently similar. *See Lee*, 574 F.3d at 261-62. There are some similarities in their employment histories: Frank was hired in 1972 and Mouney in 1978; Frank's first recorded violation was in 1985 and Mouney's was in 1984; and both had a comparable number of violations for missed calls. However, there are also critical differences: Frank had significantly more moving violations than Mouney, including one that resulted in Frank having his engineer's license suspended; and unlike Mouney, Frank was discharged in 1997 due to a failed alcohol test. Therefore, we conclude that Frank's and Mouney's employment records are not "essentially comparable," *id.* at 260; and thus, that the EEOC has not

---

[12] KCSR mistakenly claims that "[s]ix of [Thomas'] prior incidents occurred between January 2002 and January 2004." KCSR Br. 40. That misstatement is belied by KCSR's own chart, which reveals that Thomas had five infractions in that period. *Id.* at 63.

established a prima facie case of discrimination for the decision to suspend Frank for ninety days for a missed call.

#### iv.

With respect to the decision to dismiss Clarence Cargo, the EEOC contends only that it established a prima facie case based on its "same incident test." *See supra* note 4. However, the EEOC failed to argue before the district court that under *McDonald*, 427 U.S. 273, it could establish a prima facie case simply by showing that two employees of different races received disparate treatment from their participation in the same incident. Thus, we will not consider this argument for the first time on appeal. *See Nasti*, 492 F.3d at 595.

#### IV.

Having concluded that the plaintiffs established a prima facie case of discrimination with respect to the decisions to dismiss Turner and Thomas, we turn to decide whether KCSR has met its burden at the second step of the *McDonnell Douglas* analysis, *viz.*, to produce admissible evidence that these decisions were based on legitimate, nondiscriminatory reasons. We conclude that KCSR has failed to meet this burden.

In *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), the Supreme Court explained that "[t]he nature of the burden that shifts to the defendant should be understood in light of the plaintiff's ultimate and intermediate burdens." *Id.* at 253. The plaintiff's "ultimate burden" is to "persuad[e] the trier of fact that the defendant intentionally discriminated against the plaintiff." *Id.* The defendant's intermediate burden "serves to bring the litigants and the court expeditiously and fairly to this ultimate question." *Id.* At the same time, "[t]he burden that shifts to the defendant . . . is to rebut" the "presumption that the employer unlawfully discriminated against the employee," which presumption arises from the "[e]stablishment of the [plaintiff's] prima facie case." *Id.* at 254. While the defendant is not required to

"persuade the court that it was actually motivated by the proffered reasons," in order to satisfy its burden, "the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for [its decision]." *Id.* at 254-55. "An articulation not admitted into evidence will not suffice. Thus, the defendant cannot meet its burden merely through an answer to the complaint or by argument of counsel." *Id.* at 255 n.9. "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity," *id.* at 255 (footnote omitted); that is, "the inquiry . . . turns from the few generalized factors that establish a prima facie case to the specific proofs and rebuttals of discriminatory motivation the parties have introduced," *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 516 (1993). "Placing this burden of production on the defendant thus serves simultaneously to meet the plaintiff's prima facie case by presenting a legitimate reason for the action and to frame the [ultimate] factual issue [of discrimination *vel non*] with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext. The sufficiency of the defendant's evidence should be evaluated by the extent to which it fulfills these functions." *Burdine*, 450 U.S. at 255-56.

For more than four years, KCSR misidentified the relevant decisionmaker, and by the time the likely decisionmaker was identified, that person could no longer remember making the decisions to dismiss Turner and Thomas. During the EEOC's investigation and throughout the initial phases of discovery in this case, KCSR identified the pertinent decisionmakers as Paul Lobello and Robert Lane Bonds, the KCSR employees who had investigated the incidents involving Turner and Thomas. However, when the EEOC later deposed Lobello and Bonds, they testified that they did not make the dismissal decisions. Bonds testified that J.R. Thornell, KCSR's General Superintendent of Transportation from 2002 to 2005, decided to dismiss Thomas (and to dismiss and later reinstate

No. 09-30558

Joshua Hall). In 2008—six years after the decision to dismiss Turner and four years after the decision to dismiss Thomas—KCSR finally responded to the EEOC's third request for admissions by admitting that Thornell had made the decisions to terminate Turner and Thomas. However, in the same response, KCSR explained that "Thornell has no present recollection regarding" these decisions. Later that year, in a deposition conducted by the EEOC, Thornell testified that he could not remember making these decisions; and in a declaration subsequently submitted by KCSR, Thornell stated:

> 3.     As the General Superintendent, I was the person responsible for making disciplinary decisions regarding Transportation employees, including engineers and conductors.
>
> 4.     In making these disciplinary decisions, I would review the transcript of the investigation into the incident and the subject employee's disciplinary history. I also relied on the disciplinary policy in effect at the time. On many occasions I would consult with others, including the investigating officer or the Director of Labor Relations, before making a determination.
>
> 5.     I cannot be completely sure that I made the disciplinary decisions at issue in this case pertaining to Thomas Turner . . . and Lester Thomas. While it was my responsibility at the time to make these decisions, if I was absent I may have delegated the decision to someone else, primarily the Assistant Superintendent.
>
> 6.     I do not have any specific recollection of the disciplinary actions or decisions that are at issue in this case. I made many hundreds of these decisions during my tenure as General Superintendent and none of them stand out. Additionally, I have had some very serious health problems over the last several years, which have impaired my memory.

It is undisputed that the Assistant Superintendent mentioned by Thornell was A.J. Sonnier, who died during the litigation in this case. There is no deposition testimony, affidavit, or declaration from Sonnier in the record. Thus, Thornell's own declaration casts doubt on KCSR's admission that Thornell was in fact the relevant decisionmaker. In sum, the fact that KCSR misidentified the

22

No. 09-30558

relevant decisionmaker for so long makes it now impossible to know whether Thornell or Sonnier made the decisions to dismiss Turner and Thomas.

The character of the plaintiffs' ultimate burden depends on whether Sonnier or Thornell made the relevant decisions—that is, they must prove that the actual decisionmaker was motivated by race in taking the adverse employment action. Thus, the nature of the defendant's intermediate burden also depends on whether Sonnier or Thornell made the relevant decisions. *Burdine*, 450 U.S. at 253 ("The nature of the burden that shifts to the defendant should be understood in light of the plaintiff's ultimate and intermediate burdens.").[13] We note, for example, that there is extensive record evidence of race-based comments by Sonnier, which, if he were the actual decisionmaker, would be extremely probative of intentional discrimination. The purpose of "[t]he *McDonnell Douglas* division of intermediate evidentiary burdens [is] to bring the litigants and the court *expeditiously and fairly* to th[e] ultimate question" of whether "the defendant intentionally discriminated against the plaintiff." *Burdine*, 450 U.S. at 253 (emphasis added). By misidentifying the relevant decisionmaker for so long, KCSR has not acted to bring us expeditiously and fairly to this ultimate question. KCSR is no stranger to Title VII

---

[13] *See Patrick v. Ridge*, 394 F.3d 311, 319 (5th Cir. 2004) ("As the ultimate issue is the employer's reasoning *at the moment* the questioned employment decision is made, a justification that *could not* have motivated the employer's decision is not evidence that tends to illuminate this ultimate issue and is therefore simply irrelevant at this stage of the inquiry."); *Sabree v. United Bhd. of Carpenters & Joiners Local No. 33*, 921 F.2d 396, 404 (1st Cir. 1990) ("Unless . . . a defendant articulates a legitimate non-discriminatory reason that *actually* motivated the decision, the reason is legally insufficient." (internal quotation marks omitted)); *cf. Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 227 (5th Cir. 2000) ("We . . . look to who actually made the decision" because the ultimate issue is the discriminatory animus of that person.).

No. 09-30558

employment discrimination litigation,[14] and it would behoove KCSR to discharge its burden with greater acuity.

Nonetheless, the parties do not dispute that Thornell likely made the decisions to dismiss Turner and Thomas; and instead, they focus their arguments on the evidence that KCSR contends satisfies its burden. We agree with the plaintiffs that this evidence is insufficient. KCSR asserts in its brief that "[i]n determining the discipline to be issued to Turner, KCSR management considered the information contained in the transcript [of the investigative hearing], the hearing officer's assessment of the evidence, and Turner's previous disciplinary history." KCSR Br. 8. Likewise, with respect to the discipline of Thomas, KCSR asserts that "KCSR management reviewed the hearing transcript and Thomas' disciplinary record to determine the appropriate discipline." KCSR Br. 11. Because the "argument of counsel" cannot satisfy the defendant's burden, *Burdine*, 450 U.S. at 255 n.9, we must consider the specific evidence that KCSR cites in support of these assertions. We conclude that the evidence that KCSR cites fails to satisfy its burden of production.

KCSR first cites a paragraph from an affidavit of KCSR's Director of Labor Relations, Kathleen Alexander.[15] However, that paragraph indicates only that Thornell was likely the decisionmaker, and does not explain the reasons for Thornell's decisions.

Next, KCSR cites Thornell's declaration. However, this particular declaration does not satisfy the railroad's burden of production. It did not

---

[14] *See, e.g.*, *Lee v. KCSR*, 574 F.3d 253 (5th Cir. 2009); *Hannawacker v. KCSR*, 326 F. App'x 269 (5th Cir. 2009) (unpublished); *Abner v. KCSR*, 513 F.3d 154 (5th Cir. 2008); *Carter v. KCSR*, 456 F.3d 841 (8th Cir. 2006); *Grappe v. KCSR*, 71 F. App'x 302 (5th Cir. 2003) (unpublished); *Baylor v. KCSR*, 31 F. App'x 833 (5th Cir. 2002) (unpublished).

[15] Alexander's affidavit states: "During the time period that J.R. Thornell served as the General Superintendent of Field Operations for [KCSR] he was the designated employee to make the disciplinary decisions for all Brakemen Trainees, Conductors, and Locomotive Engineers ('Train and Engine' or 'T & E' employee)."

attempt to have Thornell tie his usual practice to the particular decisions made here. Neither did the declaration say that Thornell looked anew at the evidence available at the time of the discipline, nor that Thornell looked at the discharge letters the railroad sent the employees and believed that the letters properly reflected the decisions he would have made. Indeed, Thornell's saying that he might not have been the decision-maker likely eliminates its sufficiency on summary judgment. A declaration from someone who acknowledges he may not even have been the decision-maker and makes no effort to re-evaluate what he would have done at the time based on what would have been before him, produces nothing to support the employer's evidentiary burden.[16]

KCSR then cites Turner's and Thomas' discharge letters, which it says "set forth the grounds on which the Charging Parties were disciplined." KCSR Br. 53. Although the discharge letters state that Turner and Thomas were found to have violated certain workplace rules, they do not provide any reason for *Thornell's* decisions to dismiss these employees: The letters are not signed by Thornell; they do not mention the employees' disciplinary histories; and they do not give any indication that they reflect Thornell's reason for choosing to dismiss the employees, as opposed to merely suspending them. The investigating officers who signed those letters both testified that they had no part in assessing the chosen discipline, and were unclear about Thornell's reason for dismissing Turner and Thomas. Moreover, Bonds, who investigated Thomas's incident and signed Thomas's discharge letter, testified that he "didn't understand the reasoning" behind Thornell's decision to fire Thomas but reinstate Hall, and that

---

[16] KCSR contends that *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086 (5th Cir. 1995), supports its argument that Thornell's declaration satisfies its burden; however, that case does not help KCSR's position. The parties in *Mayberry* did not dispute that the defendant employer had met its burden; and the defendant employer's summary judgment evidence included an affidavit giving a specific reason for the employer's decision to suspend the plaintiff employee. *See id.* at 1091-92; *see also* Brief for Appellant at 5, 13, *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086 (5th Cir. 1995) (No. 94-10825), 1994 WL 16507696, at *5, *13.

it "seem[ed] odd" because "[i]n the past, if a crew was fired, the crew came back together."

KCSR next cites "[t]he transcripts of the investigative hearings," which again, it asserts "set forth the grounds on which discipline was decided." KCSR Br. 53. However, the hundreds of pages of transcripts that KCSR cites discuss only the circumstances of the incidents in which Turner, Frank, and Cargo were involved. (There is no transcript of any hearing related to Thomas' case.) The transcripts do not, as KCSR asserts, include any reason for why the particular disciplinary decisions were made. Indeed, the transcripts do not even include a determination about whether or not the employees violated a workplace rule.

Finally, KCSR cites "[t]he letters from Denise Brame[, KCSR's Manager of Labor Relations,] and Kathleen Alexander[, KCSR's Director of Labor Relations,] denying the appeals of the Charging Parties"; and "[t]he decisions of the various arbitral boards uphold[ing] the reasons for the disciplinary decisions." *Id.* However, these documents are insufficient. The letters from Brame and Alexander regarding Turner—there are no letters regarding Thomas' case—merely state, as did the discharge letter from Lobello, that the investigative hearing showed that Turner had violated company rules. The letters do not mention Thornell or his decision to dismiss Turner. The same is true of the decision of the Public Law Board with regard to Turner (again, there is no decision related to Thomas' case): It does not mention, nor give any reason for Thornell's decision to dismiss Turner. In fact, the Public Law Board decision is at odds with Thornell's dismissal decision: The Board decided that Turner's violation warranted only a long suspension. Thus, that decision does not provide KCSR with a legitimate, nondiscriminatory reason for the decision to dismiss Turner. Moreover, the letters and Board decision reflect decisions of people other than Thornell, made after Thornell's challenged decisions. Accordingly, they do not give any reason for *Thornell's* decisions at the time that he made

those decisions, and thus cannot satisfy KCSR's burden. *See Burdine*, 450 U.S. at 254-55; *Patrick*, 394 F.3d at 319 ("As the ultimate issue is the employer's reasoning *at the moment* the questioned employment decision is made, a justification that *could not* have motivated the employer's decision is not evidence that tends to illuminate this ultimate issue and is therefore simply irrelevant at this stage of the inquiry.").

Therefore, we hold that KCSR has not met its burden at this stage of the inquiry of producing legitimate, nondiscriminatory reasons that motivated the actual employment decisions at issue here.[17]

## V.

"In the context of an employer's motion for summary judgment seeking dismissal of an employee's discrimination [claims], a holding that the employer's offered reasons for its adverse decision does not fulfill its burden of production under *McDonnell Douglas* is the legal equivalent of the employer's having produced no reason at all." *Patrick*, 394 F.3d at 320. Thus, because "the plaintiff[s] . . . ha[ve] produced evidence sufficient to make out a *prima facie* case" with respect to the discipline of Turner and Thomas, "and the defendant employer has failed to rebut the presumption of discrimination with evidence of a legitimate, nondiscriminatory reason for its employment decision, the [plaintiffs] [are] entitled to take [their] case to a jury." *Id.* at 316 (citing *Fisher v. Vassar Coll.*, 114 F.3d 1332, 1335 (2d Cir. 1997) (en banc), *abrogated on other grounds by Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000)); *see also id.* at 320 ("As we hold that the [defendant employer] has not met its burden of producing a legitimate, non-discriminatory reason, we never reach the question whether [the plaintiffs] could demonstrate pretext, much less whether

---

[17] We need not and do not offer any opinion on whether any of this evidence is relevant to or admissible at trial to show that the employment decisions were not motivated by discriminatory animus.

discrimination actually motivated [their] employer's decision [at issue]. [The plaintiffs'] *prima facie* case thus pretermits summary judgment dismissal of [their] action, leaving the ultimate question of discriminatory animus to be determined by the trier of fact.").

We therefore affirm the district court's grant of KCSR's motion for summary judgment on the discrimination claims related to the decisions to discipline Jesse Frank and Clarence Cargo, but reverse on the claims related to the decisions to dismiss Turner Thomas and Lester Thomas; and we remand this case for further proceedings consistent with this opinion.

No. 09-30558

OWEN, Circuit Judge, concurring in the judgment in part and dissenting in part:

I would affirm the district court's judgment in its entirety. I therefore concur in the judgment the panel majority reaches in its disposition of the claims of Jesse James Frank and Clarence Cargo. I do not agree with all of the opinion's reasoning with regard to those claims and therefore join in the judgment only. I dissent with respect to the claims asserted by Thomas Turner and Lester Thomas because I would affirm the district court's grant of summary judgment in favor of Kansas City Southern Railway Company (KCSR).

## I

There is error in the panel majority opinion that pervades its analysis of Thomas Turner's claims. First, at the second stage of the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*,[1] KCSR was required to produce evidence of a legitimate, nondiscriminatory reason for its adverse employment action against Turner, not why it chose termination instead of a lesser disciplinary action or why it did not terminate other employees for similar violations.[2] KCSR has met its burden of production because there is evidence that Turner violated operational rules, termination was within the range of options for disciplining such violations, and Turner was told he was terminated due to those violations. Second, the panel majority opinion incorrectly focuses only on whether there is evidence of the reason that J. R. Thornell decided to terminate Turner. The majority's opinion rejects KCSR's

---

[1] 411 U.S. 792, 803 (1973).

[2] *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981); *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995) (holding in a work-rule violation case that "by insisting that there was no racial motivation in its decision to suspend Mayberry [and] that the decision was based solely on its conclusion, following an investigation, that Mayberry was at least partially at fault . . . [the employer] has discharged its burden of production.").

29

arguments that Thornell was not the final decision-maker and that two independent internal reviews were thereafter conducted as to whether Turner had violated operational rules and whether the discipline for those violations was appropriate. Evidence regarding these reviews establishes a neutral reason for the actions that KCSR took.[3] In fact, after the two internal reviews of the disciplinary action taken against Turner, a third review was conducted by a three-member Public Law Board that included a union representative and a neutral public member. The Board unanimously held: "[u]pon the whole record and all the evidence, . . . shoving the disabled engine over a derail can be attributed to [Turner's] negligence in not following the Rules." However, the Board converted the termination "to a long suspension," which amounted to more than a year, and directed that Turner be reinstated without back pay. The Board also admonished that, "[t]he next time [Turner] faces a disciplinary hearing for any infraction of the Rules, the next Board will surely weigh the two dismissals that were converted to long suspensions in judging the severity of the discipline."

Evidence that KCSR had a legitimate, non-discriminatory reason for concluding that Turner violated operational rules and terminating him abounds. I am mystified how the panel majority can conclude otherwise.

**A**

If the record before us does not contain evidence of a non-discriminatory reason for terminating Turner, very few records would satisfy the other two members of this panel. Within two weeks after the derailment, KCSR held an extensive hearing, with sworn testimony that was transcribed, about the cause of the derailment. The record of that hearing is voluminous. The entire focus of Turner's disciplinary proceedings at each stage was the cause of the

---

[3] *Lieberman v. Gant*, 630 F.2d 60, 65 (2d Cir. 1980) ("It is enough for the defendants in the second phase of the case to bring forth evidence that they acted on a neutral basis.").

derailment and who was at fault.  In fact, there is *no* evidence that Turner was terminated for any reason *other than* his fault in the derailment, except for the alleged disparate treatment of other employees, which will be discussed in more detail below.  While Turner continues to dispute any wrongdoing in causing the derailment, the evidence is overwhelming that KCSR thought that he was primarily, if not solely, at fault, and that he had violated operational rules. "[E]ven an incorrect belief that an employee's performance is inadequate constitutes a legitimate, nondiscriminatory reason" for an adverse employment action.[4]

There is sufficient evidence to satisfy the employer's burden of production in the burden shifting framework in employment discrimination cases.[5] Contrary to the majority opinion, the evidence frames the issue "with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext."[6]

## B

The panel's majority opinion mistakenly focuses on the initial decision to terminate Turner.  P. A. Lobello testified that after presiding over the evidentiary hearing, he concluded that Turner had violated operational rules and that those violations had resulted in the derailment.  But Lobello did not decide the disciplinary action to be taken.  He identified Thornell as the individual who made that decision.  However, this was not the final employment decision.  Two independent investigations were subsequently conducted within

---

[4] *Mayberry*, 55 F.3d at 1091 (quoting *Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991)).

[5] *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506-07 (1993); *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).

[6] *Burdine*, 450 U.S. at 255-56.

KCSR, and evidence of the reasons given for Turner's discipline at the conclusion of each of those reviews must be considered.

There is evidence that after Turner received the letter dated October 23, 2002, signed by Lobello, which said that Turner had violated seven specified operating rules and that Turner was terminated, two subsequent independent internal reviews occurred at Turner's request    First, Turner's union representative appealed the disciplinary ruling in Lobello's letter to Denise Brame, an African American whose title was Manager-Labor Relations.  In a letter dated February 3, 2003, Brame informed Turner's representative that she had "carefully reviewed the transcript of the formal investigation held and the discipline assessed" and that she had  concluded that "[t]he discipline issued in this case was fully warranted and clearly supported by the facts adduced at the formal investigation."  The letter set forth the specific violations committed by Turner.  The letter further stated

> Mr. Turner received due process in accordance with the Collective Bargaining Agreement.  As a result, the formal investigation was fair and impartial.  There was no showing of any arbitrary or capricious action against Mr. Turner by the Carrier, nor could the penalty issued be determined as unwarranted or excessive due to the importance of the proven rule violations.

This is admissible evidence of the reason articulated by KCSR for terminating Turner, and it is sufficient to meet KCSR's burden of production, even if there were no other evidence of why Turner was terminated.

A second internal review of Turner's termination occurred after Brame sent her letter.  Kathleen Alexander, whose title was Director of Labor Relations for KCSR, informed Turner's representative in a letter dated May 8, 2003, that Turner's request for reinstatement and lost pay remained declined because Turner "was afforded a fair and impartial investigation and the transcript

clearly proved that Claimant was guilty of the rules violations with which he was charged."

Turner pursued a further appeal to the Public Law Board, which consisted of a union representative, a KCSR member, and a neutral member. The Public Law Board likewise concluded that Turner was at fault in connection with the derailment, but the Board converted his dismissal to a long suspension and directed that he be reinstated without back pay.

The initial decision to terminate Turner, whether made by Thornell or another KCSR employee, was not "rubber-stamped" by any of those involved in the subsequent investigations of whether Turner had violated operational rules and the appropriate punishment.[7] Evidence regarding KCSR's entire process in disciplining Turner should be considered.

The facts before us are similar to, though far less damning than, those before the Seventh Circuit in *Jennings v. Illinois Department of Corrections*.[8] In *Jennings*, a correctional officer was terminated for smuggling contraband into a prison and trading that contraband with inmates for goods from the prison commissary.[9] Jennings contended that he was terminated and denied "a last-chance settlement agreement" because he was Mexican-American.[10] There was, in the words of the Seventh Circuit, "a plethora of evidence of discriminatory remarks and comments" about Mexican-Americans in general and Jennings, personally, by two individuals involved in investigating Jennings and recommending his termination, including the prison's warden.[11] There was also

---

[7] *See generally Mato v. Baldauf*, 267 F.3d 444, 450 (5th Cir. 2001).

[8] 496 F.3d 764 (7th Cir. 2007).

[9] *Id*. at 766.

[10] *Id*. at 766.

[11] *Id*.

evidence that "non-Mexican-Americans were treated more favorably when caught engaging in prohibited conduct."[12]  However, the Seventh Circuit looked beyond the two individuals' improper motivations.[13]  That court considered evidence that the warden had initiated an investigation against Jennings, in the course of which an independent investigator interviewed eight inmates and Jennings and concluded that Jennings engaged in the charged conduct.[14]  The evidence also revealed that the other individual who had made racially charged statements recommended a hearing before the correctional center's Employee Review Board after the independent investigation had concluded.[15]  That Board recommended discharge, and the warden signed the discharge.[16]  The Illinois Department of Central Management Services approved the discharge.[17]  The Seventh Circuit held that even assuming Jennings had made a prima facie case, the employer had met its burden of proffering a legitimate explanation of its adverse employment action by offering evidence of the independent investigation and independent arbitrator's conclusions that Jennings had engaged in trading and trafficking, which was prohibited conduct.[18]

In the present case, the decisional process beyond Thornell's involvement must be considered and provides evidence of a legitimate, nondiscriminatory reason for Turner's termination.  When evidence of that process is considered, the district court's ruling as to Turner must be affirmed.

---

[12] *Id*.

[13] *Id*. at 768.

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id*. at 768-69.

No. 09-30558

## C

The panel majority concludes that the affidavit from J. R. Thornell, dated almost seven years after the derailment, is no evidence at all of a legitimate, nondiscriminatory reason for the adverse employment action against Turner. I disagree.  Thornell's affidavit is entirely consistent with all of the contemporaneous evidence of the reason for Turner's discharge.  Furthermore, Turner knew that Thornell was involved in the disciplinary actions against him as early as the initial evidentiary hearing held within two weeks after the derailment.  The panel majority nevertheless takes KCSR to task for not identifying Thornell sooner than it did in answers to discovery requests.

The panel majority apparently would require Thornell to explain why he disciplined Turner by terminating him, instead of some lesser sanction, and to further explain why he did not terminate other employees who violated operational rules.  KCSR is not required to come forward with such evidence at the second stage of the burden-shifting framework of *McDonnell Douglas*.  As the Second Circuit has explained, the employer does not have the burden at the second stage of rebutting pretext.[19]  Such a "requirement would place on the employer at the second stage of the McDonnell Douglas process 'the burden of showing that the reason for the rejection was not a pretext, rather than requiring such proof from the employee as a part of the third step.'"[20]

Thornell avers in his declaration that as General Superintendent of Transportation, he "was the person responsible for making disciplinary decisions" regarding employees, although at times, another employee made such decisions.  Thornell "made many hundreds of these decisions" and has no specific recollection of Turner's case.  However, Turner recalls that Thornell was having

---

[19] *Lieberman v. Gant*, 630 F.2d 60, 65 (2d Cir. 1980).

[20] *Id.* (quoting *Bd. of Trustees of State College v. Sweeney*, 439 U.S. 24, 24-25 n.1 (1978)).

a discussion with Lobello outside the hearing room prior to the evidentiary hearing held shortly after the derailment. Turner knew that Thornell was involved in the decision-making process and tried to discuss his case with Thornell as Thornell and Lobello were conversing. Thornell rebuffed Turner's effort.

Lobello testified in his deposition in the present case that Thornell made the decision to terminate Turner after the hearing had concluded. Therefore, there is evidence that Thornell was the initial decision-maker regarding the consequences of Turner's violations of operating rules.

Thornell affirmatively states how he reached disciplinary decisions. He would review the transcript of the investigation into the incident and the employee's disciplinary history. He also relied on the disciplinary policy in effect at the time. He states that he never made a decision based on race. The affidavit is cumulative of considerable other evidence of the reason for Turner's discharge and is some evidence of a legitimate, nondiscriminatory reason for discharging Turner. But even if the affidavit were not part of the record, there is more than sufficient evidence of a legitimate, non-discriminatory action for the employment decision.

Contrary to the majority opinion, all of the evidence presented by KCSR regarding Turner's violation of operational rules and his termination frames the issue "with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext."[21] I strongly disagree with the majority's conclusion otherwise.

## D

The district court held that Thomas Turner, an African American, failed to establish a prima facie case of racial discrimination, and I would affirm the

---

[21] *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255-56 (1981).

district court. Turner does not contend and cannot establish that after he was terminated and before his reinstatement, he was replaced with a white person. Turner's position was not filled, and no engineers were hired at the New Orleans facility during this time period. Instead, Turner contends that he was disciplined more severely than other white employees. In order to establish a prima facie case on such a basis, Turner "must show that white employees were treated differently under circumstances 'nearly identical' to his."[22] Turner's circumstances are not similar enough to either of his proposed comparators (Schmitt and Mouney) to show disparate treatment. For the same reason, Turner cannot show that KCSR's legitimate, nondiscriminatory reason for his dismissal was pretextual.

Turner's and Schmitt's work histories are quite different. They had different jobs—Turner was an engineer, and Schmitt was a conductor. Turner controlled the movement of the train at the time of the derailment. Schmitt was on the ground, outside of the train. Their disciplinary histories differ significantly. While they may have had a comparable number of offenses, the offenses were not "nearly identical." Schmitt's positive alcohol test occurred fourteen years before the derailment at issue while he was a brakeman. Turner likewise had a positive test in the past, but Turner's infractions continued over time. In 1974, a drug test showed the presence of long-lasting barbiturates in Turner's system. In 1982, Turner was reprimanded for a deficient train inspection report. Six years later in 1988, Turner was suspended for failing a brake test. Turner had a positive drug and alcohol test only two years before the incident at issue in this case while he was an engineer, and he was terminated, until a review board reinstated him with the proviso that any violation of the reinstatement order's terms would be sufficient grounds for dismissal. While the

---

[22] *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1090 (5th Cir. 1995) (quoting *Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991)).

No. 09-30558

incident here did not implicate any of the reinstatement order's terms, the mere existence of such an order is a major difference in the work histories of Turner and Schmitt.

Turner is also not similar to Frank Mouney. Almost all of the disciplinary actions against Mouney were for missed-call violations, unlike Turner's more serious violations. In short, Turner's work history is sufficiently different from both Schmitt's and Mouney's work histories to account for the differences in discipline. Nor has Turner pointed to anything that would show that KCSR's reason for dismissal is "false or unworthy of credence."[23] Accordingly, Turner has not met his burden of producing evidence to show that KCSR's legitimate, non-discriminatory reason for his dismissal was a pretext for discrimination.

## II

The district court concluded with regard to Lester Thomas that he failed to demonstrate that he was treated differently from similarly situated employees. The only comparator offered was Hall. For the reasons stated by the district court, Hall's history of disciplinary actions was not comparable to Thomas's, and Hall's infractions were relatively minor. Hall received a five-day suspension while a helper for a sideswipe, a reprimand for a derailment while serving as engine foreman, a three-day deferred suspension for a "bad-ordered" car on an outbound train while he was a helper, and a five-day suspension for proceeding past a blue flag. By contrast, Thomas had received a 15-day suspension for failure to control the speed of a train, a five-day suspension for failing to protect a train in a shoving move and providing false information, a three-day suspension for failure to follow instructions, a 15-day deferred suspension for failure to follow instructions and other violations, a three-day suspension for failure to acknowledge the presence of a train, a reprimand for

---

[23] *Vaughn v. Woodforest Bank*, 665 F.3d 632, 637 (5th Cir. 2011).

failure to sign a work order, a 45-day suspension and a 45-day deferred suspension for occupying the main track without authority, and a ten-day suspension and a 45-day deferred suspension for derailment. The disciplinary histories of Thomas and Hall are not comparable, much less "nearly identical."

To allow a fact-finder to infer discriminatory intent from the disparate positions and disciplinary histories of the comparators that Turner and Thomas have offered is to allow a fact-finder to second-guess business decisions that KCSR employees made in the furtherance of their job responsibilities and their responsibilities to insure a safe working environment. The panel majority ignores our precedent: "we have repeatedly and emphatically stated that anti-discrimination laws 'are not vehicles for judicial second-guessing of business decisions.'"[24]

\* \* \* \* \*

I would affirm the district court's grant of summary judgment.

---

[24] *Mato v. Baldauf*, 267 F.3d 444, 452 (5th Cir. 2001) (quoting *Deines v. Tex. Dep't of Protective & Reg. Serv.*, 164 F.3d 277, 281 (5th Cir. 1999)).